# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Chuol P.M., | Case No. 21-cv-1746 (KMM/DTS) |
| Petitioner, | |
| v. | **REPORT AND RECOMMENDATION** |
| Merrick Garland, *U.S. Attorney General;* Alejandro Mayorkas, *Acting Secretary, Department of Homeland Security;* Tae Johnson, *Acting Director, Immigration and Customs Enforcement;* Marcos Charles, *Director, St. Paul Field Office, Immigration and Customs Enforcement;* and Kurt Freitag, *Sheriff, Freeborn County,* | |
| Respondents. | |

Petitioner Chuol P.M. has been in immigration detention continuously since May 16, 2019, a total of 968 days (over two and a half years), including almost one year of detention since his removal order became final. He filed this habeas petition under 28 U.S.C. § 2241 arguing his detention violates due process under the Fifth Amendment and seeking immediate release or, in the alternative, a bond hearing. He contends he has been in post-removal-order detention under 8 U.S.C. § 1231 since January 15, 2021, the date the Board of Immigration Appeals (BIA) dismissed his appeal of the removal order. He challenges his continued detention on the basis that there is no significant likelihood of his removal from the United States in the reasonably foreseeable future. *See Zadvydas v. Davis,* 533 U.S. 678 (2001).

Respondents agree that the BIA affirmed the removal order on January 15, 2021 but contend it was not a final order of removal because Chuol P.M.'s appeal of the denial of relief under the Convention Against Torture (CAT) was still pending before the BIA. His

appeal involved his application for deferral of removal to South Sudan under CAT. Because it was not a final order of removal, Respondents argue, it did not trigger the 90-day "removal period" under § 1231(a)(1)(A) during which the Government "shall remove" him from the United States. Instead, Respondents contend his removal order did not become final until August 20, 2021, when the BIA dismissed his CAT appeal. Therefore, they assert Chuol P.M.'s petition should be denied as premature because he is still within the 6-month period for which his detention is presumptively reasonable under *Zadvydas*. They also contend that, even if the removal order was final on January 15, 2021, he is still not entitled to habeas relief because he will be removed to South Sudan in the reasonably foreseeable future.

For the reasons stated below, the Court recommends that his petition be granted and that he be released from custody.

## FINDINGS OF FACT

Chuol P.M. is a native of Ethiopia and putative[1] citizen of South Sudan. Pet. ¶ 27, Ex. I.[2] He was born in a refugee camp in Ethiopia after his parents fled what was then the single nation of Sudan, which was partitioned into two countries in July 2011. Pet. ¶ 27 & n.2, Exs. B, I. He is of Nuer ethnicity. Ex. B, Chuol P.M. Decl. ¶ 1, Ex. I at 3. He entered the United States as a refugee at age four and became a lawful permanent resident in 2001. Pet. ¶ 27, Ex. A.

---

[1] Because South Sudan did not exist as a country when Chuol P.M. was born in Ethiopia to parents of Nuer ethnicity, and he has never lived in South Sudan, he argues it is not clear South Sudan would consider him a citizen or issue him identity documentation.

[2] Exhibits A to V of the Petition are found at Dkt. Nos. 1-2 to No. 1-23; Exhibits W to BB at Dkt. Nos. 19-1 to 19-6; and Exhibit CC at Dkt. No. 20-1. Exhibit indexes are found at Dkt. Nos. 1-1 and 19.

I.    **Removal Proceedings and Deferral-Under-CAT Proceedings**

The Department of Homeland Security (DHS) commenced removal proceedings in 2013 based on Petitioner's convictions for theft in the first degree and robbery in the second degree in Iowa. Pet. ¶ 28, Ex. A. He admitted the factual allegations in the Notice to Appear in an appearance before an Immigration Judge (IJ) in 2014. Ex. I at 1, Ex. J at 3. His immigration proceedings were administratively closed until his release from prison in Iowa. Kresser Decl. ¶ 7, Dkt. No. 14 at 18-19.

On May 1, 2019 he was granted parole by the Iowa Board of Parole after serving seven years of his sentence. Pet. ¶ 29, Ex. B. On May 16, 2019 he was released from the Iowa Department of Corrections to ICE custody. Pet. ¶ 30, Ex. C. He has been in immigration detention continuously since May 16, 2019. Chuol P. M. Decl. (Oct. 7, 2021) ¶ 1, Ex. AA, Dkt. No. 19-5. During his detention, ICE has not notified him of any reviews of his custody. *Id.* ¶ 5.

Before the immigration court in 2019 he submitted applications for asylum, withholding of removal, cancellation of removal, and relief under the Convention Against Torture (CAT). Pet. ¶ 31, Ex. I. A hearing was held at which he and his mother testified he would suffer harm if removed to South Sudan. Pet. ¶ 32, Ex. I. On June 27, 2019 IJ Nancy Paul found him removable for committing an aggravated felony theft offense under 8 U.S.C. § 1101(a)(43)(G) and ordered him removed to South Sudan or, in the alternative, Ethiopia. Pet. ¶ 33, Ex. A, Ex. I. She found him ineligible for asylum and withholding of removal due to his convictions. Pet. ¶ 33, Ex. I. She granted deferral of removal to South Sudan under CAT based on her determination that he would more likely than not face

torture in that country because of his Nuer ethnicity. Pet. ¶ 33, Ex. I at 4-9. She did not defer his removal to Ethiopia or any other country. Ex. I.

Chuol P.M. and DHS both appealed to the BIA. On December 16, 2019 the BIA issued a decision that his convictions did not render him removable as charged due to Iowa's definition of "theft" in its criminal statutes. It remanded to the IJ for further proceedings. Pet. ¶ 35, Ex. J. The BIA did not address IJ Paul's CAT determination. Pet. ¶ 36, Ex. J.

On remand before a different IJ, Abby Meyer, DHS withdrew the charge of removability based on a conviction for an aggravated felony theft offense. Ex. F at 2 n.1. In its place DHS filed a new charge alleging he was removable under 8 U.S.C. § 1227(a)(2)(A)(iii) because his conviction for second degree[3] robbery was an aggravated felony crime of violence. Pet. ¶¶ 36-37, Ex. E at 2-3, Ex. F at 1, Ex. K. IJ Meyer sustained the new charge and found him removable. She also reinstated IJ Paul's decision denying asylum and withholding of removal, but granting him deferral of removal to South Sudan under CAT. Pet. ¶ 37, Ex. E at 7-8.

Again both Chuol P.M. and DHS appealed to the BIA. Pet. ¶ 38, Ex. F. On January 15, 2021 the BIA dismissed his appeal of the removal order. It affirmed the IJ's ruling that he was removable under 8 U.S.C. § 1227(a)(2)(A)(iii) because his conviction for second degree robbery was an aggravated felony crime of violence. Pet. ¶ 39, Ex. F at 2-3. Chuol P.M. did not challenge the IJ's decision not to defer his removal to Ethiopia, and the BIA

---

[3] Although IJ Meyer concluded it was first degree robbery, while noting discrepancies in the record, the BIA reviewed the conviction de novo as second degree robbery and determined it was an aggravated felony crime of violence. *See* Ex. E at 4-6, Ex. F at 3, Ex. J. at 2 n.1. Any discrepancy does not affect the Court's analysis of the habeas petition.

4

deemed that issue waived. Ex. F at 2 n.2. The BIA sustained DHS's appeal of the CAT order. It vacated the decision granting deferral of removal under CAT and remanded to the IJ for further factfinding and evaluation of Chuol P.M.'s likelihood of being tortured in South Sudan. Pet. ¶ 39, Ex. F.

On remand, IJ Meyer considered the issue of deferral of removal to South Sudan under CAT and concluded Chuol P.M. had not sustained his burden. Ex. O. On March 5, 2021 she issued a decision denying his application for deferral under CAT. Ex. O. He filed an appeal, which the BIA dismissed on August 20, 2021. Ex. W at 9-15.

On September 20, 2021 Chuol P.M. filed with the BIA a motion to reconsider its August 20, 2021 decision and/or reopen his application for CAT relief and remand for further proceedings. Ex. X, Dkt. No. 19-2 at 11; Ex. CC, Dkt. No. 20-1 at 2.

## II.     Eighth Circuit Proceedings

On February 12, 2021 Chuol P.M. filed a petition for review to the Eighth Circuit challenging the BIA's dismissal of his appeal of the removal order. Ex. G. The Government moved to dismiss his review petition on the ground that the BIA decision was not a final order of removal. Ex. M. Chuol P.M. opposed the motion but proposed, as a practical alternative, that the Eighth Circuit hold both Chuol P.M.'s petition and the Government's motion in abeyance until there was an administratively final order on his application for CAT relief. Ex. N. The Government agreed with the proposal, and the Eighth Circuit ordered the petition and motion be held in abeyance. Ex. N at 1, Ex. H.

On September 13, 2021 Chuol P.M. filed a petition for review to the Eighth Circuit challenging the BIA's dismissal of his appeal of IJ Meyer's order denying deferral of removal to South Sudan under CAT. Ex. W.

The Eighth Circuit consolidated the two review petitions. Ex. W at 1. It has not stayed his removal from the United States.[4]

## III.    Habeas Petition

Chuol P.M. filed this habeas petition on July 30, 2021 alleging his prolonged detention violated the Due Process Clause of the Fifth Amendment to the Constitution. Dkt. No. 1.

## IV.    Travel Document

On August 30, 2021 Immigration and Customs Enforcement (ICE) provided Chuol P.M. with an application for an emergency travel document for South Sudan. Kresser Decl. ¶ 19. He returned it the following day. *Id.* On September 2, 2021 ICE mailed a travel document request to a liaison for presentation to South Sudan's Embassy. *Id.* ¶ 20. The ICE field office in St. Paul has repatriated at least 23 South Sudanese individuals during the 12-month period from September 2020 to September 2021. *Id.* ¶ 21. Deportation Officer Kresser's Declaration did not provide any further breakdown of the repatriation dates or whether any repatriations had occurred in 2021.

In an October 7, 2021 Declaration, Chuol P.M. states he has no identity documents from Sudan or South Sudan, given that he was born in a refugee camp in Ethiopia and came to the United States long before South Sudan became a country. Decl. ¶ 2, Ex. AA, Dkt. No. 19-5. In mid-September 2021 he spoke with an ICE officer by phone to ask about the status of his application for a travel document from South Sudan. The officer told him, based on a file review, that ICE had been in contact with the Embassy of South Sudan

---

[4] If a stay is issued, Chuol P.M.'s detention would be governed by § 1226(c). *See Amreya R.S. v. Barr,* No. 19-cv-3042, 2020 WL 2769278, at *2-3 (D. Minn. May 28, 2020) (collecting cases).

and sent his application to them. *Id.* ¶ 4. Chuol P.M. has received no further updates from ICE about a travel document and no communications from the Embassy or Government of South Sudan about his application. *Id.*

As of the date of this R&R, Respondents have not advised the Court whether Chuol P.M.'s application has in fact been presented to the Embassy of South Sudan and, if so, whether South Sudan has communicated with them about his application, or has either issued a travel document for him or denied his application. Respondents also have not provided any information that any flight has been scheduled for Chuol P.M.'s removal to South Sudan or, for that matter, that any removals to South Sudan have occurred or been scheduled since September 2021.

In addition, the record shows no intention or effort by the Government to remove Chuol P.M. to the alternate country of Ethiopia (*i.e.,* no steps to obtain for him a travel document from the Embassy of Ethiopia), nor have Respondents indicated they believe he could be removed to any country other than South Sudan.

## CONCLUSIONS OF LAW

The Due Process Clause of the Fifth Amendment forbids the Government to deprive any person of liberty without due process of law. "Freedom from imprisonment — from government custody, detention, or other forms of physical restraint — lies at the heart of the liberty that Clause protects." *Zadvydas*, 533 U.S. at 690.

The parties do not dispute that Chuol P.M. has been in continuous immigration detention for over two and a half years. They also agree he is presently detained pursuant to § 1231. They disagree on the date his removal order became administratively final for

purposes of § 1231(a)(1), a trigger date that determines how the Court should analyze his continued detention under governing law.

## I. Post-Removal-Order Detention Under 8 U.S.C. § 1231(a)

An order of removal[5] is an order "concluding that the alien is deportable or ordering deportation." 8 U.S.C. § 1101(a)(47)(A). Such order "shall become final upon the earlier of" two dates: when the BIA affirms it, or when the time for seeking review by the BIA expires. *Id.* § 1101 (a)(47)(B).

Once an alien is ordered removed, DHS must physically remove him from the United States within a 90-day "removal period." *Id.* § 1231(a)(1)(A); *Johnson v. Guzman Chavez*, 141 S.Ct. 2271, 2281 (2021). The removal period begins on the latest of three dates: (1) the date the order of removal becomes administratively final, (2) the date of the final order of any court that entered a stay of removal, or (3) the date on which the alien is released from non-immigration detention or confinement. 8 U.S.C. § 1231(a)(1)(B); *Guzman Chavez*, 141 S.Ct. at 2281.

Under § 1231, the removal period may be extended in at least three circumstances, such that an alien remains detained after 90 days have passed. *Guzman Chavez*, 141 S.Ct. at 2281. First, the removal period may be extended if the alien fails to make a timely application for travel documents or acts to prevent his removal. § 1231 (a)(1)(C). Second, DHS may stay the immediate removal of certain aliens if it decides that such removal is not practicable or proper, or if the alien is needed to testify in a pending

---

[5] The terms "removal" and "deportation" mean the same thing. *Lopez v. Heinauer.* 332 F.3d 507, 510 n.3 (8th Cir. 2003); *see also Nasrallah,* 140 S.Ct. at 1691 (final order of removal is a final order concluding an alien is deportable or ordering deportation, citing § 1101(a)(47)(A)).

prosecution. § 1231(c)(2)(A). Third, an alien may be detained beyond the removal period or released under supervision if he is (a) inadmissible, (2) removable as a result of violations of status requirements, entry conditions, or the criminal law, or for national security or foreign policy reasons, or (3) a risk to the community or unlikely to comply with the removal order. § 1231(a)(6); *see also* 8 C.F.R. § 241.4 (setting out procedures DHS must follow to impose continued detention). Continued detention under this provision creates the "post-removal-period." *Guzman Chavez*, 141 S.Ct. at 2281.

Chuol P.M.'s detention during the post-removal-period is authorized by § 1231(a)(6) because he was found removable under § 1227(a)(2) due to his criminal conviction. *See* § 1231(a)(6) ("An alien ordered removed who is . . . removable under section . . . 1227(a)(2) . . . may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph (3)").

The statute does not specify a time limit on how long DHS may detain an alien in the post-removal-period. However, the Supreme Court has read an implicit limitation into the statute "in light of the Constitution's demands" and has held than an alien may be detained only for "a period reasonably necessary to bring about that alien's removal from the United States." *Guzman Chavez*, 141 S.Ct. at 2281 (quoting *Zadvydas*, 533 U.S. at 689). That period is presumptively six months from the date the removal order is administratively final, which includes the mandatory 90-day removal period. *Id.* at 2281-82 (citing *Zadvydas,* 533 U.S. at 701). After that point, if the alien "provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future," the Government must either rebut that showing or release the alien. *Id.* at 2282 (quoting *Zadvydas*, 533 U.S. at 701).

## II.    Analysis

Chuol P.M. asserts he has been detained for almost a year since his removal order became administratively final on January 15, 2021 when the BIA dismissed his appeal of removability. He seeks release, or alternatively a bond hearing, under *Zadvydas* on the ground that there is no significant likelihood he will be removed in the reasonably foreseeable future.

Respondents have raised multiple grounds for denying the petition as this case has proceeded. They concede that on January 15, 2021 the BIA affirmed the removal order, but contend this was not a final order of removal because he still had a pending appeal to the BIA of the IJ's denial of his application for deferral of removal to South Sudan under CAT. *See* Aug. 24, 2021 Letter (First Letter) at 1-2 & nn. 1 & 2, Dkt. No. 7; Response at 2-3, Dkt. No. 14. Accordingly, their initial argument opposing Chuol P.M.'s habeas petition was that he was in pre-removal-order detention governed by § 1226(c), not post-removal-order detention under § 1231 and *Zadvydas*. *See* First Letter at 2-4.

On August 20, 2021, about three weeks after he filed his petition, the BIA dismissed his appeal of the denial of CAT relief. Respondents filed a letter with the Court asserting that the order of removal was now final and therefore he was within the 90-day removal period during which detention is mandatory under § 1231(a)(2) to enable the Government to carry out his removal. *See* Sept. 1, 2021 Letter (Second Letter) at 1, Dkt. No. 8. Thus, when they filed their formal response on September 10, 2021, they argued his petition should be denied as premature because the Government "will effect his removal in the reasonably foreseeable future" during (1) the 90-day removal period or (2)

the subsequent 90-day period during which his continued detention is presumptively reasonable under *Zadvydas*. The 90-day removal period that Respondents claim was triggered by the August 20, 2021 order expired in late November. No party has advised the Court that Chuol P.M. has been removed from the United States.

Thus, the Court must first decide whether his detention pursuant to § 1231 commenced on January 15, 2021 (almost a year ago) or August 20, 2021 (four and a half months ago). If the latter, his petition is premature under *Zadvydas.* If the former, the Court must determine whether there is a significant likelihood he will be removed in the reasonably foreseeable future.

### A.    Triggering the 90-Day Removal Period

Chuol P.M. argues that the language and reasoning in two recent Supreme Court cases, *Nasrallah* in 2020 and *Guzman Chavez* in 2021, compel the conclusion that his removal order became administratively final on January 15, 2021, thus triggering the 90-day removal period. Pet. 3, 8-9 Dkt No. 1; Reply 1-2, 9-10, Dkt. No. 18. Respondents failed to even mention — much less analyze, reconcile, or distinguish — those two cases.

In fact, Respondents barely deigned to respond at all to the Court's orders that they answer the habeas petition. They ignored the Court's first order to file a "reasoned memorandum of law and fact fully stating Respondents' legal position on Petitioner's claims," including "[s]uch affidavits and exhibits as are needed to establish the lawfulness and correct duration" of his detention. Order, Dkt. No. 3. Instead, they filed a perfunctory letter that brushed off his key argument in a footnote, saying he was "mistaken" but not addressing in any way the legal authority he cited for his position that he has been detained under § 1231 since January 15, 2021. *See* First Letter at 2 n.2, Dkt. No. 7.

11

Respondents asserted he was detained under § 1226. Another footnote instructed the Court to go read the Government's arguments in a legal memorandum filed in a wholly unrelated case in January 2020 — a date notably before the Supreme Court issued the *Nasrallah* and *Guzman Chavez* decisions on which Chuol P.M. relies. *Id.* at 3 n.3. Thus, even if the Court were inclined to accept Respondents' invitation to mentally cut-and-paste the other case's legal memorandum into their letter, that memorandum could not provide any insight on the legal underpinnings of Chuol P.M.'s arguments. Furthermore, it is unclear how Respondents expected the Court to assess his individual circumstances and detention based on a memorandum pertaining to a different person in factually different immigration proceedings.

In any event, by the time Respondents sent the First Letter, the BIA had dismissed Chuol P.M.'s appeal of the denial of CAT relief, and thus they agreed that § 1231 governed his detention. Respondents sent the Second Letter advising the Court of the BIA's disposition of the CAT appeal but, like the First Letter, it did not address his argument based on *Nasrallah* and *Guzman Chavez*. Second Letter, Dkt. No. 8. Consequently, on September 2, 2021 the Court issued a second order for Respondents to comply with the Court's first order to file an answer to Chuol P.M.'s petition that included all required documents, such as a memorandum of law and any relevant affidavits and exhibits. Order, Dkt. No. 12. Respondents filed a memorandum of law and a declaration by a deportation officer but again they did not mention *Nasrallah* or *Guzman Chavez*. Dkt. No. 14.

In those decisions the Supreme Court emphasized the separate and distinct nature of a removal order versus a country-specific order of relief such as a CAT order. In

*Nasrallah* the Court discussed those differences in the context of determining the scope of judicial review of a CAT order[6] for aliens who have committed crimes specified in § 1252(a)(2)(C), as opposed to judicial review of a removal order. 140 S.Ct. at 1688. It stated that, "[i]n the deportation context, a final 'order of removal' is a final order 'concluding that the alien is deportable or ordering deportation.'" *Id.* at 1691 (citing § 1101(a)(47)(A)). Thus, a "CAT order is not itself a final order of removal because it is not an order 'concluding that the alien is deportable or ordering deportation.'" *Id.* Accordingly, a CAT order "does not disturb the final order of removal," "affect the validity of the final order of removal," or otherwise "merge into the final order of removal." *Id.* (quoted in *Guzman Chavez*, 141 S.Ct. at 2288). This is so even though a CAT order is reviewable as part of the review of a final order of removal. *Id.* at 1690-91 ("FARRA [Foreign Affairs Reform and Restructuring Act of 1998, which implements CAT] and § 1252(b)(9) simply establish that a CAT order may be reviewed together with the final order of removal, not that a CAT order is the same as, or affects the validity of, a final order of removal"). "A CAT order is distinct from a final order of removal and does not affect the validity of a final order of removal." *Id.* at 1694.

In *Guzman Chavez* the Supreme Court reiterated the "whether" versus "where" distinction between a removal order and a country-specific relief order, this time in the context of the detention of aliens subject to reinstated orders of removal who then sought withholding of removal to a particular country. The Court explained that, notwithstanding the pendency of withholding-only proceedings, "DHS retains its authority . . . to remove

---

[6] The CAT relief at issue in *Nasrallah* was "withholding" rather than "deferral" of removal, but the Court finds this difference does not affect the analysis of the relevant legal principles.

the alien to any country other than the country that is the subject of those proceedings."

141 S.Ct. at 2291. It stated:

> If an immigration judge grants an application for withholding of removal, he prohibits DHS from removing the alien *to* that particular country, not *from* the United States. The removal order is not vacated or otherwise set aside. It remains in full force, and DHS retains the authority to remove the alien to any other country authorized by the statute.

*Id.* at 2285.

The Court specifically rejected the argument that § 1231 governs detention only if DHS has "eliminate[d] all legal impediments to removal." *Id.* at 2290. It also rejected the argument that the feasibility of or practical difficulties involved in carrying out the removal have any bearing on when a removal order is administratively final for purposes of triggering the 90-day removal period in § 1231(a). *Id.* at 2291. The Court concluded that its "decision in *Zadvydas* confirms this distinction between whether an alien is to be removed and where an alien is to be sent." *Id.* at 2287.

There is no question that Chuol P.M. was "ordered removed" from the United States and that the BIA dismissed his appeal of the removal order on January 15, 2021. Thus, the question "whether" he was "to be removed" was not pending, it was administratively decided. At that point, DHS was free to remove him from the United States to Ethiopia or to any country authorized by statute, just not to South Sudan, which was the subject of ongoing proceedings to determine whether removal to that country would be deferred under CAT.

Respondents cite cases from the Ninth and Fourth Circuits to support their position. *See Abdisalan v. Holder,* 774 F.3d 517 (9th Cir. 2014); *Kouambo v. Barr*, 943 F.3d 205 (4th Cir. 2019); Response at 4-5, Dkt. No. 14. But, in addition to being outside

this Circuit, those cases contain no discussion of what triggers § 1231(a)'s 90-day removal period, and they pre-date the Supreme Court's decisions in *Nasrallah* and *Guzman Chavez*. Respondents have provided no basis for the Court to conclude that the removal order was not administratively final on January 15, 2021. DHS had legal authority to carry out his removal from the United States pursuant to that order. DHS had legal authority to remove him to Ethiopia or to another country authorized by statute. The only authority it lacked was the authority to remove him to South Sudan due to the pendency of CAT proceedings specific to that country. Thus, the Court concludes his habeas petition is not premature, because Petitioner is not within the 90-day removal period and not within the post-removal-period during which his detention is presumptively reasonable under *Zadvydas*.

### B.    Likelihood of Removal

As noted above, the Supreme Court in *Zadvydas* interpreted § 1231(a)(6), the post-removal-period detention statute, in light of the demands of the Due Process Clause of the Fifth Amendment. It found that six months was presumptively the "period reasonably necessary to bring about [an] alien's removal from the United States." *Zadvydas*, 533 U.S. at 689, 701. "After that point, if the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must either rebut that showing or release the alien." *Guzman Chavez*, 141 S.Ct. at 2282 (citing *Zadvydas*, 533 U.S. at 701) (internal quotation marks omitted). This test reflects the Supreme Court's "conclu[sion] that, once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute." *Zadvydas*, 533 U.S. at 699.

Chuol P.M. argues there is good reason to believe he is not likely to be removed in the reasonably foreseeable future. He asserts South Sudan is unlikely to issue him a travel document in the near future, if ever, and conditions there have left the Government barely functional so that actual removal is unlikely to occur anytime soon. As evidence he offers the Declaration of an expert on South Sudan and information posted on the website of South Sudan's Embassy alerting the public that it is working at reduced capacity due to the Covid-19 pandemic and has suspended the routine issuance of emergency travel documents "especially in cases associated with immigration deportations."

Ferenc David Marko is an expert on South Sudan with particular expertise in its state bureaucracy, including issues of citizenship and the South Sudan Nationality Act of 2011. Marko Decl. ¶¶1-2, 8-9, Ex. BB, Dkt. No. 19-6. His experience includes research as well as intensive fieldwork in the country. *Id.* ¶¶ 1-2. He frequently briefs United Nations missions; governments, including the United States Department of State and the European Union; and non-governmental organizations (NGOs) active in South Sudan. *Id.* ¶ 2. He states that years of civil war and a collapsed economy have led to widespread destruction of government infrastructure and "capacity to deliver any services or to barely function at all." *Id.* ¶¶ 3-6. Many services that would normally be performed by the Government were taken over by international NGOs, but the Covid-19 pandemic caused them to severely limit their programs and outreach. *Id.* ¶ 7. Closure of international borders and limitations on travel meant that international humanitarian workers were unable to enter South Sudan. As a result, many South Sudan nationals (who were severely underpaid due to currency devaluation) left government employment to fill the

jobs with the NGOs, which further eroded the Government's capacity and slowed down the bureaucracy. *Id.* ¶¶ 5, 7.

Marko states that claiming citizenship in South Sudan is a complex task that is even more difficult for persons who have never lived there. *Id.* ¶ 8. A citizenship applicant must prove he belongs to an ethnic community by securing the recommendation of his traditional tribal leader and by verifying his identity with a next-of-kin witness, who should be an elder. *Id.* ¶ 10. "For applicants who have never lived in South Sudan, both of these requirements can be challenging, sometimes outright impossible to meet." *Id.* "Several ethnic communities — especially the Nuer who are from Western Ethiopian refugee camps — are seen with suspicion at the citizenship office." *Id.* ¶ 14. Applying for an emergency travel document, not full citizenship, is usually a more straightforward process, but "is still a challenging and sometimes impossible task, especially for people who were born in a refugee camp." *Id.* ¶¶ 8, 13. "Almost nobody in South Sudan or people born in the neighboring refugee camps possess birth certificates or any other material evidence of their identity." *Id.* ¶ 8. Providing a time estimate for the "process"[7] is "almost impossible" but "in the case of an individual who is Nuer, this process would likely take at least several months." *Id.* ¶ 15.

The website of the South Sudan Embassy states that it is working at limited capacity due to the Covid-19 pandemic:

> Our phone lines are unattended during the COVID-19 pandemic.
>
> ***

---

[7] Paragraph 15 of the Declaration is not entirely clear whether the time estimate for the "process" means the process involved in establishing citizenship, the process to receive an emergency travel document, the process to receive identity documents needed for citizenship and/or a travel document, or all of the above.

> The Embassy of the Republic of South Sudan wishes to inform the public that due to the outbreak of the Coronavirus (COVID-19), all Embassy personnel will be working from home until further notice.

https://www.southsudanembassyusa.org (last accessed Jan. 7, 2022).

The official website specifically states that it has "suspended" the issuance of emergency travel documents "especially" regarding immigration deportations. In "exceptional circumstances" the Embassy "may still" issue a travel document, but the examples of such circumstances do not encompass Chuol P.M.'s situation. The website states, in relevant part:

**Important Information**

1.  The routine issuance of Emergency Travel Document (ETD) is suspended, especially in cases associated with immigration deportations.

\* \* \*

3.  ETD may still be issued to South Sudanese citizens in exceptional circumstances that may include:

    ●  Citizens holding South Sudan passport, visiting or residing in USA, who for one reason or another may not use their South Sudan passport to return home, i.e., in cases of expired, damaged, lost or stolen passports;

    ●  Dual citizens, i.e. South Sudanese holders of USA or Canadian passports who must travel on short notice to South Sudan due to a confirmed emergency, and who for justified reasons, cannot use their USA/Canadian passport.

\* \* \*

https://www.southsudanembassyusa.org/emergency-travel/ (last accessed Jan. 7, 2022).

18

In addition, though not cited in Petitioner's briefing, the Court takes notice that the United States Department of State has issued a Level 4 Do Not Travel Advisory for South Sudan:

> Do not travel to South Sudan due to COVID-19, crime, kidnapping, and armed conflict.

https://www.travel.state.gov/content/travel/en/traveladvisories/traveladvisories/south-sudan-travel-advisory (last accessed January 7, 2022).

In their Response filed in September 2021, Respondents correctly point out that some of Chuol P.M.'s arguments in his habeas petition are now moot, given that the BIA dismissed his appeal of the denial of CAT relief so that issue is now administratively closed.[8] But they offered no specific facts regarding the purported imminence of his removal to South Sudan, except to say that his travel document application was mailed to an ICE liaison to present to the Embassy, that the Government has a "recent track record of South Sudanese removals," and that he would be removed to South Sudan[9] by November 20, 2021, the date that Respondents asserted marked the end of the 90-day removal period. Kresser Decl. ¶¶ 20-21, Response at 8, Dkt. No. 14.

But he was not removed to South Sudan by November 20, 2021 or as of the date of this R&R. Four months have passed since their Response, including the Kresser

---

[8] His petition argued that his CAT proceedings could go on for a long period of time, but in fact they concluded just a few weeks after his petition was filed.

[9] Although the removal order identified Ethiopia as an alternative country for removal, Respondents do not mention any efforts to remove him to Ethiopia. They do not challenge Chuol P.M.'s statements that there is no indication Ethiopia would issue a travel document to a person born in a refugee camp to then-Sudanese parents and, even if it did, no reason to believe flights will resume to Ethiopia in light of the civil conflict there. *See* Pet. ¶ 51 n.4 (citing *Hussein S.M. v. Garland*, No. 20-cv-348, 2021 WL 1986125, at *2-3 (D. Minn. May 18, 2021) (granting habeas relief because removal to Ethiopia was not likely in the reasonably foreseeable future due to intensified civil unrest and armed conflict)).

Declaration, and they have not provided any updated information to the Court about the status of DHS's efforts to remove him, nor have they sought to respond[10] to his evidence that country conditions in South Sudan, along with his individual circumstances as a person of Nuer ethnicity born in a refugee camp in Ethiopia before South Sudan became independent, demonstrate there is no significant likelihood of removal in the reasonably foreseeable future. Therefore, based on the present record, it is not known whether a travel document request was ever actually presented to the Embassy of South Sudan, whether the Embassy issued or denied a travel document for Chuol P.M., whether any flight has been scheduled for his removal to South Sudan, or whether in fact any individuals have been removed to South Sudan since September 2021. Respondents have not rebutted Chuol P.M.'s evidence that there is no significant likelihood he will be removed in the reasonably foreseeable future.

The Court finds that Chuol P.M. has been in prolonged detention and has provided good reason to believe there is no significant likelihood he will removed in the reasonably foreseeable future, which Respondents have not rebutted. Therefore, under *Zadvydas* his continued detention is unreasonable. *See Zadvydas*, 533 U.S. at 699-700 ("if removal is not reasonably foreseeable, the court should hold continued detention unreasonable and no longer authorized by statute"). Accordingly, Chuol P.M. must be released from custody.[11] DHS may impose appropriate release conditions, through an order of

---

[10] Chuol P.M. provided information in his October 7, 2021 Reply and Exhibits and an October 27, 2021 status letter. Dkt. Nos. 18, 19, 20. Respondents have provided no updated information (if they have any) to the Court since the factually sparse Declaration of Deportation Officer Kresser dated September 9, 2021.

[11] Because of the Court's recommended disposition, it need not address Chuol P.M.'s alternative argument that he receive a bond hearing, or Respondents' argument that

supervision, as authorized by law. *See Bah v. Cangemi*, 489 F.Supp.2d 905, 923-24 (D. Minn. 2007) (aliens released from custody under *Zadvydas* may be subjected to appropriate release conditions set forth in federal regulations).

## RECOMMENDATION

For the reasons set forth above, the Court RECOMMENDS THAT Chuol P. M.'s Petition for Writ of Habeas Corpus [Dkt. No. 1] be GRANTED and that he be released from custody subject to any appropriate release conditions authorized by law.

Dated: January 7, 2022                                 s/ David T. Schultz
                                                       DAVID T. SCHULTZ
                                                       U.S. Magistrate Judge


## NOTICE

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. *See* Local Rule 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).

---

Chuol P.M. is not and never will be entitled to a bond hearing so long as he is detained pursuant to § 1231.